**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LISA BERNATCHE,

Plaintiff,

v.

GRAND TRAVERSE COUNTY HEALTH AND HUMAN SERVICES BOARD *d/b/a* GRAND TRAVERSE PAVILIONS,

Defendant.

Case No.

Hon.

David A. Nacht (P47034)
NACHTLAW, P.C.
*Attorneys for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
(734) 663-7550
dnacht@nachtlaw.com

**PLAINTIFFS' COMPLAINT AND JURY DEMAND**

NOW COMES Plaintiff Lisa Bernatche, by and through her attorneys, NACHTLAW, P.C., who hereby brings this action against Defendant Grand Traverse County Health and Human Services Board, doing business as Grand Traverse Pavilions, and hereby alleges as follows:

**PARTIES**

1. Plaintiff Lisa Bernatche is an individual residing in Eastlake, Michigan.

2. Defendant Grand Traverse County Department of Health and Human Services Board, doing business as Grand Traverse Pavilions, is a facility and employer whose principal place of business is located at 1000 Pavilions Circle, Traverse City, Michigan 49684.

## JURISDICTION AND VENUE

3. This Court has original subject-matter jurisdiction over Plaintiff's federal age discrimination claim because it arises under the laws of the United States. 28 USC § 1331.

4. This Court has supplemental jurisdiction over Plaintiff's state-law public policy claim because it is so related to the federal claim that it forms part of the same case or controversy under Article III of the United States Constitution. 28 USC § 1367.

5. Venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here. 28 USC § 1391.

## FACTUAL ALLEGATIONS

6. Plaintiff was employed as a Registered Nurse by Defendant for 28 years, having been hired on June 6, 1996, and dedicated nearly three decades to serving vulnerable residents on the Subacute Rehab and Long-Term Care Units.

7. Accordingly, Plaintiff was a highly tenured, older employee who had earned a pension.

8. Plaintiff performed her job duties well throughout her long tenure, as reflected in her annual performance evaluations, which consistently noted that she successfully met expectations, worked well as a part of the team, and maintained excellent standards of nursing practice. She also consistently demonstrated strong clinical skills and a high level of commitment, earning multiple certificates of achievement for perfect attendance and dedication to her residents and co-workers.

9. Plaintiff's recent annual performance evaluation noted no performance issues.

10. Despite her excellent performance, Plaintiff faced severe workplace hostility, including being harassed and stalked by a co-worker; Defendant initially denied her requests for safety accommodations.

11. Furthermore, Defendant's management harbored animus toward older, long-tenured employees who were eligible for substantial pensions. During union negotiations, management representatives explicitly stated that there would be more room for raises once some of the long timer pensions are gone, demonstrating a direct financial motive to target and eliminate older employees.

12. In early 2024, Defendant placed Plaintiff on a Performance Improvement Plan ("PIP"). During this PIP process, Plaintiff explicitly complained to management that she was being unfairly targeted, stating that the facility had it out for her and was trying to get her fired.

13. At the time she was placed on the PIP, Plaintiff requested her personnel file but received nothing, demonstrating that Defendant subsequently built a post-hoc disciplinary file to justify her termination.

14. In the Fall of 2024, the Centers for Medicare & Medicaid Services ("CMS") cited Defendant with a "G" level deficiency on a Form 2567 related to a resident's wrongful death and an acute change of condition that had been missed by a prior shift.

15. Following this incident, Plaintiff fulfilled her professional duties and mandated reporting obligations by truthfully documenting the patient's care and internally reporting the prior shift's failures.

16. Plaintiff steadfastly refused to conceal, alter, or falsify these internal medical records to cover up the neglect, despite the facility's obvious interest in minimizing its liability. Plaintiff's internal documentation and refusal to falsify records constituted protected acts in furtherance of recognized public policy protecting patient safety and the integrity of medical records.

17. Defendant's management harbored immediate hostility toward Plaintiff for refusing to conceal the care failures. Management began closely monitoring Plaintiff and seeking an opportunity to terminate her employment.

18. On October 15, 2024, demonstrating an exceptionally close temporal proximity of less than 24 hours to her protected activities, Defendant abruptly

targeted Plaintiff using an unrelated patient incident regarding oxygen saturation as a pretext for discipline.

19. During the oxygen saturation incident, Plaintiff followed both the provider's orders and the resident's expressed wishes, and CMS issued no citation whatsoever regarding Plaintiff's care.

20. Despite this, Human Resources Director Levi Petrone, a non-clinical administrator, obtained protected health information ("PHI") regarding this resident from former Director of Nursing Liz Payne and misused it during the human resources disciplinary process to target Plaintiff.

21. Defendant's weaponization of this resident's data constituted a misuse of PHI and a potential HIPAA violation, which Defendant never reported to the State Board of Nursing. The resident involved was made aware of the misuse of their information and expressed severe distress over Plaintiff's termination.

22. On October 16, 2024, Defendant abruptly suspended Plaintiff.

23. In the days following her suspension, management scrambled to construct a justification for termination. On or about October 21, 2024, Payne and Petrone exchanged a series of internal communications concerning Plaintiff's employment status, expressing uncertainty regarding their grounds for termination, and acknowledging that they wanted to terminate Plaintiff but were unsure if they had sufficient cause to do so. Payne persistently focused the communications on

Plaintiff's alleged failure to call a provider regarding a resident's oxygen saturation, attempting to build a post-hoc file to justify the predetermined termination.

24. That same day, Plaintiff again requested her personnel file, but Petrone explicitly refused to provide it.

25. Also on October 21, 2024, management held a formal disciplinary meeting with Plaintiff attended by Petrone, Human Resources Technician Elissa Riffle, Assistant Director of Nursing Regina Kiogima, and Union Steward Chelsea Nash. During this meeting, Plaintiff was presented with the option to resign or accept a "just-cause involuntary termination."

26. On October 25, 2024, at 11:36 AM, Petrone sent an email, which Payne immediately forwarded, abruptly announcing Plaintiff's involuntary termination for "just cause."

27. This reason was knowingly false. Management centered the pretextual discipline on this allegation while deliberately ignoring Defendant's own standing order policy that permitted updating the provider the next day when initiating oxygen for a resident on comfort measures.

28. Defendant's decisionmakers possessed actual knowledge that Plaintiff's actions were compliant with this official protocol before they terminated her for it, proving the discipline was entirely pretextual.

29. Defendant scheduled a termination meeting with Plaintiff for 2:00 PM that day, purposefully excluding her union steward Nash by failing to provide advance notice.

30. The same day, Defendant issued a formal termination letter finalizing Plaintiff's involuntary discharge. To construct a post-hoc justification, the termination letter baselessly cited a history of acting outside the scope of her nursing role, deficient documentation regarding symptom onset, failure to notify providers, and regular medication errors.

31. To further pad the file, Defendant resurrected an April 18, 2023 Employee Counseling Form alleging Plaintiff yelled at CNA staff, was confrontational with ancillary staff, and informed residents of low staffing, alongside a September 16, 2024 complaint from Assistant Director of Nursing Christina Wagatha regarding workplace conflicts and medication administration.

32. Isolating each deviation from stated policy that management ignored, Defendant demonstrated pretext by systematically violating its own protocols to execute Plaintiff's termination. Specifically, management ignored these established standards by: (1) penalizing Plaintiff despite her proper use of the standing-order protocol permitting next-day provider notification for comfort measures; (2) proceeding with termination despite a complete lack of documented noncompliance regarding patient care; (3) authorizing a stark departure from ordinary progressive

discipline and comparable enforcement practices; (4) engaging in a post-hoc construction of just cause to rationalize a predetermined outcome; (5) issuing a bad-faith refusal to provide the personnel file to Plaintiff upon request; and (6) purposefully orchestrating the exclusion of the union steward from the termination meeting.

33. Further undermining Defendant's pretextual rationale, on October 25, 2024, a coworker, Naomi Rode, submitted a formal complaint to the state regarding the exact oxygen saturation incident management used to terminate Plaintiff. In November 2024, state investigators reviewed the incident, completely cleared Plaintiff, and found the facility in compliance with no issues regarding her care.

34. Rode subsequently emailed Attorney General Special Agent Motte regarding Defendant's wrongful termination of Plaintiff and the weaponization of HIPAA. As a result, on August 18, 2025, Agent Motte and five other special agents performed an on-site investigation at Defendant's facility regarding these complaints and related fraud concerns.

35. Defendant's disciplinary policy regarding provider notification and medication administration has been enforced disparately. Upon information and belief, Defendant routinely issues lesser discipline or no discipline to substantially younger nurses who engage in similar or more severe alleged infractions. Defendant's strict and fatal application of its policy against Plaintiff was a departure

from its standard enforcement patterns, selectively weaponized to target an older, pension-eligible employee.

36. As a direct result of Defendant's actions, Plaintiff suffered immense financial damage. Although Plaintiff mitigated her hourly wage damages by obtaining employment as an operating room nurse at a hospital in Manistee earning approximately $40.00 an hour, she lost out on significantly higher overall wages because Defendant's pay structure heavily rewarded her 28 years of tenure.

37. Furthermore, Plaintiff lost her employer-provided health insurance, which is critical for her survival as an insulin-dependent diabetic, and suffered catastrophic damage to her pension benefits, which were calculated based on her highest-paid years of long-term service.

**COUNT I — AGE DISCRIMINATION IN EMPLOYMENT ACT**

38. Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

39. Plaintiff is over the age of 40 and belongs to a protected class under the Age Discrimination in Employment Act ("ADEA"). 29 USC § 631.

40. Defendant discharged Plaintiff and otherwise discriminated against her with respect to her compensation, terms, conditions, or privileges of employment because of her age. 29 USC § 623.

41. Defendant's stated reasons for terminating Plaintiff were false and pretextual, designed to mask its underlying discriminatory intent to terminate older, long-tenured employees and eliminate their pension obligations.

42. Pleading in the alternative, even if Defendant's pretextual disciplinary investigation was initially triggered by retaliatory animus for Plaintiff's protected documentation and reporting, Plaintiff's age and pension-eligible status were the but-for cause of her ultimate termination.

43. Defendant seized upon an unrelated, compliant patient interaction as a convenient opportunity to execute its expressed goal of eliminating older, long-tenured employees to erase their pension obligations, and Defendant would not have actually terminated Plaintiff but for her age.

44. Furthermore, because Plaintiff has presented direct evidence of Defendant's discriminatory animus, this constitutes a mixed-motive case wherein Defendant bears the ultimate burden of persuasion under the but-for causation framework to prove it would have terminated Plaintiff even absent her age and pension-eligible status.

45. Defendant's violation of the ADEA was willful. 29 USC § 626.

46. As a direct and proximate result of Defendant's unlawful age discrimination, Plaintiff has suffered and continues to suffer significant damages, including loss of income, lost pension benefits, and lost health insurance benefits.

## COUNT II — WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

47. Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

48. Plaintiff engaged in a protected activity and fulfilled a recognized public policy obligation when she truthfully documented and internally reported patient care details internally and refused to alter, conceal, or falsify clinical records regarding a wrongful death and patient neglect incident.

49. Plaintiff's refusal to violate the law and her adherence to mandatory nursing duties concerning patient safety and medical record integrity are strictly protected by well-established state public policy.

50. Defendant terminated Plaintiff in direct retaliation for her internal documentation and refusal to conceal the neglect.

51. Pleading in the alternative, even if Defendant's pretextual disciplinary investigation was initially triggered by discriminatory animus regarding Plaintiff's age and pension-eligible status, Plaintiff's protected internal documentation and refusal to falsify records independently motivated and was the but-for cause of her ultimate termination.

52. As a direct and proximate result of Defendant's wrongful discharge, Plaintiff has suffered significant economic and non-economic damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and grant the following relief:

A. Compensatory damages for lost past and future wages, lost pension benefits, and lost health insurance benefits;

B. Liquidated damages for Defendant's willful violation of the Age Discrimination in Employment Act;

C. Reinstatement to her former position, or in the alternative, front pay;

D. Non-economic damages for emotional distress and mental anguish;

E. Reasonable attorney's fees and costs of the action; and

F. Such other and further legal or equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

NACHTLAW, P.C.
*/s/ David A. Nacht*
David A. Nacht (P47034)
*Attorneys for Plaintiff*
501 Avis Dr, Ste. 3
Ann Arbor, MI 48108
(734) 663-7550

Dated: November 12, 2026